**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

Eastern District of Kentucky
**F I L E D**

JUN 0 6 2018

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES OF AMERICA**

**V.**                                            **INDICTMENT NO.** 5:18-CR-60-JMH

**BRADLEY PRICE,
BRANDON PRICE,
JIMMY PRICE, and
LONNIE BRIERLY**

\*   \*   \*   \*   \*

**THE GRAND JURY CHARGES:**

## INTRODUCTION

1.      The Defendants herein and others worked together to defraud the United

States through the filing of false insurance claims ultimately reimbursed by the United

States Department of Agriculture ("USDA"), by making false statements and reports in

connection with the federal crop insurance program.

**Statutory Background**

2.      In 1938, Congress passed the Federal Crop Insurance Act ("Act"), 7 U.S.C.

§ 1501 *et seq.*, in order to promote the economic stability of agriculture in the United

States through, in part, a system of crop insurance.

3.      In furtherance of this purpose, Congress established the Federal Crop

Insurance Corporation ("FCIC"), which was authorized to insure crop losses due to

drought, flood, or other natural disaster, as determined by the Secretary of the USDA. 7

U.S.C. § 1503, 1508. Tobacco, wheat, corn, and soybeans were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

4.     The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with a bona fide insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such naturally occurring events caused the harvest for the farm to be less than the amount specified in the insurance contract or written policy agreement, also known as the "guarantee." These federally-backed crop insurance policies are referred to as multi-peril crop insurance ("MPCI") policies.

5.     Farmers who opt to insure their crop are required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his or her yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his or her crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under the policy.

6.     Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold and the cause of loss.

7.     The insurance coverage, also called the guarantee, and premiums of coverage are based on four or more years of production records for a particular crop

grown by a farmer on a specific farm designated by its unique Farm Serial Number

("FSN"). This means that the farmer's actual production history ("APH") determines the

insurance policy's guarantee, based on how much of that crop the farmer has produced on

that FSN during each of the four years immediately preceding the year for which

insurance is sought. 7 U.S.C. § 1508. If a farmer has produced that crop for more than

four years, the guarantee will be based upon that farmer's production history of those

preceding years, but no more than ten years of production history will be used. 7 U.S.C.

§ 1508. A new producer is a person who has not actively engaged in farming of the crop

sought to be insured in the county for more than two years. 7 C.F.R. § 400.52. New

producers are given an estimated production yield based upon the county average

production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and

400.55(b)(6).

     8.     Through the federal program, a farmer can elect to insure tobacco crop up

to 75% of the APH guarantee. If a farmer elects 75% coverage on his tobacco crop, that

farmer needs to sustain crop damage in excess of 25% to trigger a claim payment. A

farmer can elect to insure corn and soybean crops up to 85% of the APH guarantee and

may elect revenue protection.

     9.     The Risk Management Agency ("RMA") is an agency of the USDA that

supervises the FCIC and administers all programs authorized under the Act. 7 U.S.C.

§ 6933. Most crop insurance is sold by approved private insurance companies, called

Approved Insurance Providers ("AIPs"), through an insurance agent working on behalf of

the AIP. AIPs are reinsured by the FCIC/RMA under provisions established in a

Standard Reinsurance Agreement ("SRA"), a contract between the AIPs and RMA. The FCIC/RMA also pays, or subsidizes, a portion of the premium paid by the farmer.

10.     The insurance agent obtains basic information from the producer pertaining to the crop to be insured. This information is reported on forms the producer sends to his or her agent. The producer and agent acknowledge on these forms that failure to report completely and accurately may void the applicant's crop insurance policy and may result in criminal or civil false claims actions. The crop insurance agent forwards this information through the insurance company to FCIC/RMA. This information, including the Production Worksheet, is used to calculate the premium to be paid by the producer for the insurance, and is also used to calculate the indemnity in the event of a loss claim.

11.     Producers often elect to take their crop to harvest even after the crop has sustained damage. A Production Worksheet is used to record the amount of harvested production to include crop sales, quality assessments, and harvest appraisals, among other things, to ascertain the production to count, or actual yield, used in determining the indemnity due. The producer certifies on this report that failure to report completely and accurately may result in the voiding of the applicant's crop insurance contract and may result in criminal or civil false claims actions.

12.     The FCIC tobacco crop provisions provide for quality loss adjustment should the burley tobacco crop sustain damage reducing the quality of the crop. RMA's procedures for burley tobacco rely on grades assigned by Agriculture Marketing Service ("AMS") graders using USDA Official Standard Grades. The lowest grade quality is a No Grade ("NOG"). A loss that reduces the quality, or grade, of the tobacco can result in

an increased indemnity.

13.     According to RMA established procedures, if the producer believes he or she has a potential loss of quality, he or she must determine which bales of tobacco need to be graded. The Tobacco Administration Grading Service ("TAGS") was established to facilitate the grading process and provide scheduling services via telephone or a website. A producer with a potential loss of quality can schedule an inspection with the AMS grader by contacting TAGS. The producer may ask his or her crop insurance agent for assistance in scheduling an inspection. The producer is charged a fee for the grading process. The producer receives a unique Grading Confirmation Number ("GCN") intended to track the bales graded. AMS electronically transmits the GCN information to RMA. Tobacco bales designated as NOG receive the highest discount factor resulting in a higher amount of loss, and thus, higher indemnities. The grade, weights, and other relevant information is transmitted to the appropriate insurance company to complete the claim.

14.     When a loss is paid on a crop insurance policy, the loss is calculated by the AIP and paid to the producer, often through the agent. Pursuant to the SRA, the AIP is reimbursed by the FCIC/RMA.

15.     Insured producers are required to retain documentation related to their crop from planting through the disposition of their crop, including receipts for seed and other expenditures. They may be required to turn this documentation over to their agent or AIP to justify claims of loss or other inquiries.

## FACTUAL BACKGROUND

16.    At all times relevant hereto, the Defendants owned and rented farmland within the Eastern District of Kentucky. **BRADLEY PRICE** farmed land in Nicholas and Bourbon Counties, **BRANDON PRICE** farmed land in Nicholas County, **JIMMY PRICE** farmed land in Nicholas and Bourbon Counties, and **LONNIE BRIERLY** farmed land in Nicholas and Bourbon Counties. Each produced tobacco, among other crops, from at least 2010 through 2015, and each had crop insurance during some or all of this period.

17.    **BRADLEY PRICE** and **BRANDON PRICE** are the sons of **JIMMY PRICE**. **LONNIE BRIERLY** is an associate of the Price family, who has periodically assisted farming the Price farmland.

### COUNTS 1-5
### 18 U.S.C. § 1014

18.    Paragraphs 1 through 17 above are re-alleged and incorporated herein by reference.

19.    On or about the dates listed below, in Bourbon and Nicholas Counties, in the Eastern District of Kentucky and elsewhere,

### BRADLEY PRICE

knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | False Statement |
|-------|------|-----------------|
| 1 | February 12, 2010 | Production Worksheet for Crop Year 2009, stating that **BRADLEY PRICE** produced a total of 10,014 pounds of tobacco on 29 acres on Farm Number 2673. |
| 2 | February 19, 2011 | Production Worksheet for Crop Year 2010, stating that **BRADLEY PRICE** produced a total of 7,309 pounds of tobacco on 34.5 acres on Farm Number 2673. |
| 3 | February 19, 2012 | Production Worksheet for Crop Year 2011, stating that **BRADLEY PRICE** produced a total of 8,834 pounds of tobacco on 26 acres on Farm Number 2673. |
| 4 | February 11, 2014 | Production Worksheets for Crop Year 2013, stating that **BRADLEY PRICE** produced 12,690 pounds of tobacco on 22 acres on Farm Number 2673, 21 acres on Farm Number 3173, and 15 acres on Farm Number 3172. |
| 5 | March 10, 2015 | Production Worksheet for Crop Year 2014, stating that **BRADLEY PRICE** produced 4,610 pounds of tobacco on 25 acres on Farm Number 2673, 24 acres on Farm Number 3172, and 8 acres on Farm Number 2487. |

All in violation of Title 18, United States Code, Section 1014.

## COUNTS 6-9
## 18 U.S.C. § 1014

20.    Paragraphs 1 through 17 above are re-alleged and incorporated herein by reference.

21.    On or about the dates listed below, in Nicholas County, in the Eastern District of Kentucky and elsewhere,

## BRANDON PRICE

knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | False Statement |
|-------|------|-----------------|
| 6 | April 12, 2010 | Production Worksheet for Crop Year 2009, stating that **BRANDON PRICE** produced a total of 6,314 pounds of tobacco on 16 acres on Farm Number 2426. |
| 7 | February 19, 2011 | Production Worksheet for Crop Year 2010, stating that **BRANDON PRICE** produced a total of 3,280 pounds of tobacco on 17 acres on Farm Number 2426. |
| 8 | February 20, 2012 | Production Worksheet for Crop Year 2011, stating that **BRANDON PRICE** produced a total of 6,411 pounds of tobacco on 17 acres on Farm Number 2426. |
| 9 | April 6, 2015 | Production Worksheets for Crop Year 2014, stating that **BRANDON PRICE** produced 10,200 pounds of tobacco on 11 acres on Farm Number 2673 and 15 acres on Farm Number 2427. |

All in violation of Title 18, United States Code, Section 1014.

### COUNTS 10-12
### 18 U.S.C. § 1014

22.     Paragraphs 1 through 17 above are re-alleged and incorporated herein by reference.

23.     On or about the dates listed below, in Bourbon and Nicholas Counties, in the Eastern District of Kentucky and elsewhere,

### JIMMY PRICE

knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | False Statement |
|-------|------|-----------------|
| 10 | February 12, 2011 | Production Worksheets for Crop Year 2010, stating that **JIMMY PRICE** produced a total of 8,295 pounds of tobacco on 14.51 acres on Farm Number 2673, 10.2 acres on Farm Number 3064, |

|    |    | and 9.15 acres on Farm Number 3030. |
|----|----|-------------------------------------|
| 11 | February 19, 2012 | Production Worksheets for Crop Year 2011. stating that **JIMMY PRICE** produced a total of 14,492 pounds of tobacco on 15.5 acres on Farm Number 2673 and 14.2 acres on Farm Number 3064. |
| 12 | April 6, 2015 | Production Worksheets for Crop Year 2014 stating that **JIMMY PRICE** produced a total of 12,804 pounds of tobacco on 9 acres on Farm Number 2673, 8 acres on Farm Number 2427, and 14 acres on Farm Number 3064. |

All in violation of Title 18, United States Code, Section 1014.

## COUNTS 13-15
### 18 U.S.C. § 1014

24.     Paragraphs 1 through 17 above are re-alleged and incorporated herein by reference.

25.     On or about the dates listed below, in Bourbon and Nicholas Counties, in the Eastern District of Kentucky and elsewhere,

### LONNIE BRIERLY

knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | False Statement |
|-------|------|-----------------|
| 13 | March 11, 2011 | Production Worksheet for Crop Year 2010, stating that **LONNIE BRIERLY** had a 100% insurable interest in 12 acres of tobacco on Farm Number 2414 and that **BRIERLY** produced 849 pounds on the 12 acres. |
| 14 | February 11, 2014 | Production Worksheet for Crop Year 2013, stating that **LONNIE BRIERLY** had a 100% insurable interest in 5 acres of tobacco on Farm Number 2673 and that **BRIERLY** produced 1,194 pounds of tobacco on the 5 acres. |

| 15 | March 10, 2015 | Production Worksheet for Crop Year 2014, stating that **LONNIE BRIERLY** had a 100% insurable interest in 12 acres of tobacco on Farm Number 3172 and that **BRIERLY** produced 4,871 pounds of tobacco on that 12 acres. |

All in violation of Title 18, United States Code, Section 1014.

### COUNT 16
### 18 U.S.C. § 371

26.    From in or about December 2012, and continuing through in or about March 2015, in Nicholas and Bourbon Counties, in the Eastern District of Kentucky and elsewhere,

### BRADLEY PRICE

and others, including E.P., knowingly and willfully conspired and agreed to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

#### Purpose of the Conspiracy

27.    It was the purpose of the conspiracy to profit through the filing of false and fictitious crop insurance claims and the sale of unreported tobacco.

#### Manner and Means

28.    Paragraphs 1 through 19 above are re-alleged and incorporated herein by reference.

29.    In furtherance of the conspiracy, **BRADLEY PRICE** produced tobacco in

crop years 2013 and 2014, which far exceeded the amount of tobacco he claimed to have produced to his insurance company. **PRICE's** Production Worksheets understating his production were thus false.

30.     In order to hide this additional crop from his insurance company and the federal government, **BRADLEY PRICE** enlisted E.P. and others to assist in hiding the tobacco production in the following way: With the help of E.P., **BRADLEY PRICE** sold some of the hidden tobacco under his name and, after depositing the checks for the sale of this tobacco into his individual account, wrote checks for the same amount as the proceeds of those sales to Clay's Tobacco Warehouse.  In this way, **BRADLEY PRICE** appeared to have purchased the tobacco he sold under his name from Clay's Tobacco Warehouse and never reported the hidden production to his insurance company.

### Overt Acts

31.     On or about January 31, 2015, **BRADLEY PRICE** deposited a check from Philip Morris International for $34,056.36 into his bank account.  **BRADLEY PRICE** issued a new check to Clay's Tobacco Warehouse for the same amount, which cleared on February 3, 2015.

32.     On or about March 2, 2015, **BRADLEY PRICE** deposited two checks from Philip Morris International that totaled $5,950.74 into his bank account.  He then issued a check to Clay's Tobacco Warehouse for the same amount, which cleared on March 12, 2015.

All in violation of Title 18, United States Code Section 371.

## COUNT 17
### 18 U.S.C. § 371

33.     From in or about December 2012, and continuing through in or about

March 2015, in Nicholas County, in the Eastern District of Kentucky and elsewhere,

### BRANDON PRICE

and others, including E.P., knowingly and willfully conspired and agreed to commit an

offense against the United States, that is, making false statements and reports for the

purpose of influencing in any way the actions of the FCIC, and companies the FCIC

reinsures, upon application, advance, commitment, loan, and insurance agreement or

application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

### Purpose of the Conspiracy

34.     It was the purpose of the conspiracy to profit through the filing of false and

fictitious crop insurance claims and the sale of unreported tobacco.

### Manner and Means

35.     Paragraphs 1 through 17 and 21 above are re-alleged and incorporated

herein by reference.

36.     In furtherance of the conspiracy, **BRANDON PRICE** produced tobacco in

crop years 2013 and 2014, which far exceeded the amount of tobacco he claimed to have

produced to his insurance company.  **PRICE's** Production Worksheets understating his

production were thus false.

37.     In order to hide this additional crop from his insurance company and the

federal government, **BRANDON PRICE** enlisted E.P. and others to assist in hiding the

tobacco production in the following way: With the help of E.P., **BRANDON PRICE** sold some of the hidden tobacco under his name and, after depositing the checks for the sale of this tobacco into his individual account, wrote checks for the same amount as the proceeds of those sales to Clay's Tobacco Warehouse. In this way, **BRANDON PRICE** appeared to have purchased the tobacco he sold under his name from Clay's Tobacco Warehouse and never reported the hidden production to his insurance company.

### Overt Acts

38.     On or about January 8, 2015, Golden Burley Tobacco Corp. issued a check payable to **BRANDON PRICE** and Farm Service Agency ("FSA") for $25,079.18. **BRANDON PRICE** received this check and deposited it into his bank account. He then issued a check to Clay's Tobacco Warehouse for the same amount, which cleared on January 13, 2015.

39.     On or about March 10, 2015, **BRANDON PRICE** deposited checks from Burley Tobacco Growers Coop. for $2,391.94, $4,589.63, $17,588.92, and $19,654.47 into his bank account. He then issued checks to Clay's Tobacco Warehouse for the same amounts, which cleared on March 12, 2015.

All in violation of Title 18, United States Code, Section 371.

### COUNT 18
### 18 U.S.C. § 371

40.     From in or about December 2012, and continuing through in or about March 2015, in Nicholas and Bourbon Counties, in the Eastern District of Kentucky and elsewhere,

### JIMMY PRICE

and others, including E.P., knowingly and willfully conspired and agreed to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

### Purpose of the Conspiracy

41.     It was the purpose of the conspiracy to profit through the filing of false and fictitious crop insurance claims and the sale of unreported tobacco.

### Manner and Means

42.     Paragraphs 1 through 17 and 23 above are re-alleged and incorporated herein by reference.

43.     In furtherance of the conspiracy, **JIMMY PRICE** produced tobacco in crop years 2013 and 2014, which far exceeded the amount of tobacco he claimed to have produced to his insurance company.  **PRICE's** Production Worksheets understating his production were thus false.

44.     In order to hide this additional crop from his insurance company and the federal government, **JIMMY PRICE** enlisted E.P. and others to assist in hiding the tobacco production in the following way: With the help of E.P., **JIMMY PRICE** sold some of the hidden tobacco under his name and, after depositing the checks for the sale of this tobacco into his individual account, wrote checks for the same amount as the proceeds of those sales to Clay's Tobacco Warehouse.  In this way, **JIMMY PRICE**

appeared to have purchased the tobacco he sold under his name from Clay's Tobacco Warehouse and never reported the hidden production to his insurance company.

## Overt Acts

45.     On or around March 10, 2014, **JIMMY PRICE** received a check from Burley Tobacco Growers Coop. in the name of Hovermales Enterprise for $19,548.13 and another check in his own name for $19,942.87, both of which **JIMMY PRICE** deposited into his own account. **JIMMY PRICE** then issued two checks to Clay's Tobacco Warehouse for the same amounts, which cleared on March 12, 2014.

46.     On or about January 8, 2015, Golden Burley Tobacco Corp. issued a check payable to **JIMMY PRICE** and FSA for $20,352.87.  **JIMMY PRICE** received this check and deposited it into his bank account.  He then issued a check to Clay's Tobacco Warehouse for the same amount, which cleared on January 13, 2015.

All in violation of Title 18, United States Code, Section 371.

## COUNT 19
## 18 U.S.C. § 371

47.     From in or about December 2012, and continuing through in or about March 2015, in Nicholas and Bourbon Counties, in the Eastern District of Kentucky and elsewhere,

## LONNIE BRIERLY

and others, including E.P., knowingly and willfully conspired and agreed to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC

reinsures, upon application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

### Purpose of the Conspiracy

48.     It was the purpose of the conspiracy to profit through the filing of false and fictitious crop insurance claims and the sale of unreported tobacco.

### Manner and Means

49.     Paragraphs 1 through 17 and 25 above are re-alleged and incorporated herein by reference

50.     In furtherance of the conspiracy, **LONNIE BRIERLY** produced tobacco in crop years 2013 and 2014, which far exceeded the amount of tobacco he claimed to have produced to his insurance company. **BRIERLY's** Production Worksheets understating his production were thus false.

51.     In order to hide this additional crop from his insurance company and the federal government, **LONNIE BRIERLY** enlisted E.P. and others to assist in hiding the tobacco production in the following way: With the help of E.P., **LONNIE BRIERLY** sold some of the hidden tobacco under his name and, after depositing the checks for the sale of this tobacco into his individual account, wrote checks for the same amount as the proceeds of those sales to Clay's Tobacco Warehouse. In this way, **LONNIE BRIERLY** appeared to have purchased the tobacco he sold under his name from Clay's Tobacco Warehouse and never reported the hidden production to his insurance company.

### Overt Acts

52.     On or about March 10, 2014, **LONNIE BRIERLY** deposited a check from

Burley Tobacco Growers Coop. for $9,906.00, into his wife's bank account. **BRIERLY's** wife then wrote a check to Clay's Tobacco Warehouse for the same amount, which cleared on March 12, 2014.

53.     On or about March 2, 2015, **LONNIE BRIERLY** deposited a check from Burley Tobacco Growers Coop. for $17,453.18 into his bank account.  He then issued a check to Clay's Tobacco Warehouse for the same amount, which cleared on March 12, 2015.

All in violation of Title 18, United States Code, Section 371.

### COUNT 20
### 18 U.S.C. § 1956(h)

54.     From in or about December 2012, and continuing through on or about March 15, 2015, in the Eastern District of Kentucky and elsewhere,

**BRADLEY PRICE,**
**BRANDON PRICE,**
**JIMMY PRICE, and**
**LONNIE BRIERLY**

did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, to wit:

(a) knowingly conducting and attempting to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, 18 U.S.C. § 1014, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified

unlawful activity, and that while conducting and attempting to conduct such

financial transactions, knew that the property involved in the financial

transactions represented the proceeds of some form of unlawful activity, in

violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

(b) knowingly engaging and attempting to engage in monetary transactions by,

through, or to a financial institution, affecting interstate commerce, in

criminally derived property of a value greater than $10,000, such property

having been derived from a specified unlawful activity, that is, 18 U.S.C.

§ 1014, in violation of 18 U.S.C. § 1957.

**Manner and Means**

55.    Paragraphs 1 through 54 above are re-alleged and incorporated herein by

reference.

56.    The manner and means used to accomplish the objectives of the conspiracy

included, among others, the following:

57.    **BRADLEY PRICE, BRANDON PRICE, JIMMY PRICE,** and

**LONNIE BRIERLY** produced tobacco crop in crop years 2013 and 2014, which far

exceeded the amount of tobacco they claimed to have produced to their insurance

companies, as explained in Counts 16 through 19.  In order to conceal the nature and

source of the proceeds of sales of this hidden production from insurance companies and

the federal government, **BRADLEY PRICE, BRANDON PRICE, JIMMY PRICE,**

and **LONNIE BRIERLY** enlisted E.P. and others to assist in concealing the proceeds of

the scheme, for a fee.

58.    Many transactions designed to assist in concealing the nature and source of the proceeds of the crop insurance fraud involved issuing checks traced to proceeds in amounts greater than $10,000.

59.    **BRADLEY PRICE, BRANDON PRICE, JIMMY PRICE,** and **LONNIE BRIERLY** accomplished this in the following way:

      a.    After Clay's Tobacco Warehouse received checks from the defendants designed to make it appear as though they purchased their tobacco from Clay's Tobacco Warehouse, Clay's Tobacco Warehouse issued checks payable to Farm Credit Mid America ("FCMA").

      b.    At FCMA, these payments were then split amongst the defendants, with some deposits applying to the FCMA accounts of E.P., as payment for his assistance, and to C.P. and J.W., associates of E.P., and some new checks issued to **BRADLEY PRICE, BRANDON PRICE,** and **JIMMY PRICE.**

      c.    **BRADLEY PRICE, BRANDON PRICE,** and **JIMMY PRICE** deposited these funds back into their respective bank accounts.

60.    Specifically, on or around March 10, 2014, **JIMMY PRICE** received a check from Burley Tobacco Growers Coop. in the name of Hovermales Enterprise for $19,548.13 and another check in his own name for $19,942.87, both of which **JIMMY PRICE** deposited into his own account.  On or about March 10, 2014, **LONNIE BRIERLY** received a check from Burley Tobacco Growers Coop. for $9,906.00, which was deposited into his wife's bank account. On or about March 15, 2014, **BRADLEY PRICE** deposited a check from Philip Morris International for $42,270.91 into his own

account and that of **JIMMY PRICE**. These checks represented the proceeds from sales

of tobacco **JIMMY PRICE, LONNIE BRIERLY,** and **BRADLEY PRICE** intended to

hide from their insurance companies and the federal government.  In order to conceal

these proceeds, **JIMMY PRICE, LONNIE BRIERLY,** and **BRADLEY PRICE** issued

checks to Clay's Tobacco Warehouse for the same amounts as the proceeds.  Clay's

Tobacco Warehouse combined these checks with other substantial checks, and, at the

direction of E.P., used these funds to deposit money into FCMA accounts in the name of

E.P., C.P., and K.W. and to fund a check to **BRADLEY PRICE** for $77,305.80.

61.     On or about January 8, 2015, Golden Burley Tobacco Corp. issued checks

payable to **BRANDON PRICE** and FSA for $25,079.18, and to **JIMMY PRICE** and

FSA for $20,352.87. These checks represented the proceeds from sales of tobacco

**BRANDON PRICE** and **JIMMY PRICE** intended to hide from their insurance

companies and the federal government.  In order to conceal these proceeds, which

amounted to $45,432.05, **BRANDON PRICE** and **JIMMY PRICE** deposited these

checks into their bank accounts and then issued new checks to Clay's Tobacco

Warehouse for the same amounts.  On or about January 12, 2015, Clay's Tobacco

Warehouse issued a check to FCMA, and E.P. directed FCMA to deposit some of this

money into the account of E.P. and to issue checks to **BRANDON PRICE**, in the amount

of $18,834.68, **JIMMY PRICE**, in the amount of $15,297.37, and others.

62.     On or about January 31, 2015, **BRADLEY PRICE** deposited a check from

Philip Morris International for $34,056.36 into his bank account.  This check represented

the proceeds from the sale of tobacco **BRADLEY PRICE** intended to hide from his

insurance company and the federal government. In order to conceal these proceeds, **BRADLEY PRICE** issued a new check to Clay's Tobacco Warehouse for the same amount. On or about February 3, 2015, Clay's Tobacco Warehouse issued a check to FCMA for $157,887.67, and E.P. directed FCMA to disburse money into the FCMA accounts of E.P., C.P., J.W., and to issue a check to **BRADLEY PRICE** for $27,429.36.

63.     On or about March 10, 2015, **BRANDON PRICE** deposited checks from Burley Tobacco Growers Coop. for $2,391.94, $4,589.63, $17,588.92, and $19,654.47 into his bank account. The same day, **JIMMY PRICE** deposited a check from Golden Burley Tobacco Corp. for $2,323.37 into his bank account. On or about March 2, 2015, **BRADLEY PRICE** deposited checks from Philip Morris International that totaled $5,950.74 into his bank account. On or about March 2, 2015, **LONNIE BRIERLY** deposited a check from Burley Tobacco Growers Coop. for $17,453.18 into his bank account. These checks represented the proceeds from sales of tobacco that **BRANDON PRICE, JIMMY PRICE, BRADLEY PRICE,** and **LONNIE BRIERLY** intended to hide from their insurance companies and the federal government. In order to conceal these proceeds, **BRANDON PRICE, JIMMY PRICE, BRADLEY PRICE,** and **LONNIE BRIERLY** issued new checks to Clay's Tobacco Warehouse for the exact same amount. On or about March 11, 2015, Clay's Tobacco Warehouse then issued a check to FCMA, which, at the direction of E.P., was used to fund deposits into FCMA accounts in the name of E.P., C.P., and J.W., and checks to **BRANDON PRICE** for $21,169.31, and **BRADLEY PRICE** for $39,507.41.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION
### 18 U.S.C. § 982
### 18 U.S.C. § 981(a)(l)(C)
### 28 U.S.C. § 2461(c)

In committing the felony offenses alleged in Counts 1 through 19 of this Indictment, each punishable by imprisonment for more than one year, **BRADLEY PRICE, BRANDON PRICE, JIMMY PRICE, and LONNIE BRIERLY** shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of violations of 18 U.S.C. § 1014.

In committing the felony offenses alleged in Count 20 of this Indictment, punishable by imprisonment for more than one year, **BRADLEY PRICE, BRANDON PRICE, JIMMY PRICE, and LONNIE BRIERLY** shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1) any property, real or personal, involved in such offense or any property traceable to such property.

The property to be forfeited includes, but is not limited to, the following:

**REAL PROPERTY:**

1. 109.46 acres of land on Parcel Number 018-00-00-008.00, located on Lower Jackstown Road in Nicholas County, Ky., owned by Bradley and Jennifer Price and recorded in Deed Book 129, page 496, in the Nicholas County Clerk's Office.

2. 68 acres of land on Parcel Number 022-00-00-016.00, located on Old Paris Road in Nicholas County, Ky., owned by Jimmy and Dana Price

and recorded in Deed Book 99, page 408, in the Nicholas County

Clerk's Office.

**CASH/CURRENCY:**

All funds on deposit in the following Farmer's Deposit Bank Accounts:

1.  ****748, in the name of Bradley and Jennifer Price

2.  ****980, in the name of Brandon Price

3.  ****069, in the name of Jimmy and Dana Price

4.  ****710, in the name of Jimmy and Dana Price

5.  ****084, in the name of Lonnie Brierly

**MONEY JUDGMENT:**

As against **BRADLEY PRICE**, $264,352, representing the approximate

amount of proceeds derived from crop insurance fraud and property

involved in or traceable to money laundering.

As against **BRANDON PRICE**, $110,257, representing the approximate

amount of proceeds derived from crop insurance fraud and property

involved in or traceable to money laundering.

As against **JIMMY PRICE**, $110,526, representing the approximate

amount of proceeds derived from crop insurance fraud on crop insurance

records and property involved in or traceable to money laundering.

As against **LONNIE BRIERLY**, $52,857, representing the approximate

amount of proceeds derived from crop insurance fraud and property

involved in or traceable to money laundering.

**SUBSTITUTE ASSETS:**

If any of the property listed above, as a result of any act or omission of the

defendant,

> (1) cannot be located upon the exercise of due diligence
> (2) has been transferred or sold to, or deposited with, a third party;
> (3) has been placed beyond the jurisdiction of the Court;
> (4) has been substantially diminished in value; or
> (5) has been commingled with other property which cannot be divided without
> difficulty;

it is the intent of the United States to seek the forfeiture of any other property in which

the above defendant has an interest, up to the value of the judgment described above and

pursuant to 21 U.S.C. § 853(p), as incorporated in 18 U.S.C. § 982(b)(1).

**A TRUE BILL**

**ROBERT M. DUNCAN, JR.**
**UNITED STATES ATTORNEY**

## **PENALTIES**

**COUNTS 1-15:**     Not more than than 30 years imprisonment, $1,000,000 fine or twice
the gross gain or loss, and 5 years supervised release.

**COUNTS 16-19:**    Not more than 5 years imprisonment, $250,000 fine or twice the
gross gain or loss, and 3 years supervised release.

**COUNT 20:**        Not more than 20 years imprisonment, $500,000 fine or twice the
gross gain or loss, and 3 years supervised release.

**PLUS:**            Mandatory special assessment of $100 per count.

**PLUS:**            Restitution, if applicable.